May I proceed? Good morning, Your Honors. Good morning. May it please the Court, I would like to reserve three minutes for rebuttal. I will address three key issues raised by this matter. First, that the appellant's appeal in OAH-1 was accepted for mootness or was not moot, that the right to prevailing parties as part of that is an independent basis for jurisdiction. Two, that withholding of CM's RTI data and staff communications regarding him constituted a per se denial of a fate. It prevented a fair hearing at the due process, and it prohibited the Court from exercising jurisdiction to reduce prevailing party attorney fees. Third, I will address the private right of action under the IDEA against the Lafayette School District for its intentional violations and breach of their statutory duties and the California Department of Education for its breach of its statutory duties. Before you proceed with your argument, could you give us an update on the status of the student? The student is performing below basic in reading. Still enrolled in Lafayette School District? Still enrolled in the Lafayette School District, below basic in reading and math. His emotional status is he's still receiving treatment. So every year this process is being repeated even as this litigation goes on. In other words, the IEPs, et cetera, correct? That's correct. A recent triennial is underway. It's in the process, so it has been two triennials now since this litigation. And my second preliminary question is the bottom line of this case. I gather when you, at the end of the merits consideration, you're talking about fees and reimbursement. Is that sort of the bottom line of this appeal? Fees, well, reimbursement, compensatory education, which is we're seeking two years of comp ed. And just to give you some context for the reimbursement amount is approximately $15,400 for educational services that the family purchased. Attorney fees for OAH-1 alone are approximately $44,000, as is demonstrated by our fee bills. For the 11-day hearing, it's approximately $88,000. That's just administratively. So that's the scope of the burden of attorney fees. So counsel, may I ask procedurally, as the IEPs are done each year, there's a right to challenge them administratively? Yes, Your Honor. And so has that been done? No, Your Honor. Okay. I was just curious. So there are no other pending administrative or legal challenges except the ones before us. Is that fair to say? That's correct, Your Honor. Okay. Thank you. And we think that that is indicative of, despite ongoing disputes about the accuracy of the subsequent assessment and the appropriateness of the services, that these proceedings have chilled the family's rights to really proceed in that manner. They are put to the question of, do you want to invest in tutor services and educational services for your child that you may never recover, or do you want to litigate and incur fees that you will never recover? Because the district can essentially moot your case at any point under the ruling by Judge Ilston. They can agree to do another assessment or basically do another assessment, and that would moot the claims under Judge Ilston's ruling. So regarding the mootness question, one, we feel that the mootness, the case was not moot and the law is clear that if some relief is provided, then the case is not moot. The plaintiff's appellants contended that the right to an IEE at no expense to the family was the issue, and they were awarded relief for the evaluator attending the IEP meeting. And this issue of capable of repetition yet evading review, Judge Ilston found that it was unlikely that the family would delay in requesting an IEE, and we have to emphasize that delay was built into this child's review process from the beginning because the school district did not evaluate him pursuant to his parents' request in October 2006. So this child, every year his review period is during the last two months of school. The family requested an IEP meeting in 2008 in May before the end of school, which never occurred or occurred without any records, and this delay prevents this family from subsequent challenges to the assessments that are done. Even the triennial assessment on its face, you'll see seven months transpired before there was a final version of the report. So delay is inherent in this child's IEP, and it's very likely that it would take a child whose process is interrupted by summer vacations twice. It would take more than 12 months to review, and school districts are free to resume their position that after a year they can reevaluate and terminate the right to challenge an assessment that they are relying on to drive services. So, counsel, in your view, what would be a reasonable period of time to complete the assessment process? The statutory period to challenge the sufficiency of the assessment is two years. That's what the hearing officer found. They're provided two years, and when a parent's ability to discern the child's progress, their needs, is impeded by the district withholding assessment data relating to this child, specifically this child's assessments, three times a year, that demonstrated his areas of deficit, his problems, when that kind of information is withheld, a parent cannot reasonably challenge an assessment or its accuracy when they have no, they don't have complete data. I thought you were making a reference to the fact that the district took seven months to complete a portion of the assessment. And I thought your intimation was that that was an unreasonably long period of time when you said delay was built into the process. So I was asking you, what would be a reasonable time for the district to have completed that portion of the process? Well, there can be delays. That's a factually driven question. My point was not that that was an unreasonable delay. My point was that it is highly likely, contrary to Judge Ilsen's finding, that this family would delay more than a year before they could dispute the sufficiency of a district's evaluation. So she, on that fact, found it was not capable of repetition and did not evade review, because the family would immediately challenge an assessment. So a family gets their assessment. They, under this administrative procedures, they have to demonstrate a denial of a FAPE or impairment of the parent's rights. They're not going to know that instantly. They're going to have to, and the IDEA contemplates a cooperative process. They're going to work with the school district to see if they can mitigate any defects, if they can get those services to the child. That takes time, and it takes a school year to see whether the child's made progress. So you're necessarily going to have an assessment that lasts for a year before you can even tell whether what you've been told is accurate and whether it matters. So that standard in the administrative process makes sense that the parents have two years to evaluate the sufficiency of the district's assessment, and the district's efforts to cut off that right and basically moot their challenge to an assessment by interposing a new assessment is improper, and particularly if we can demonstrate that it's in bad faith. I don't believe that the court understood the process of cutting off the family's right to an IEE, because it's predicated upon disagreement with the district assessment. So if you can interpose a new assessment, it moots those challenges. When the school district clearly relied on those assessments and was saying, those assessments are perfectly fine to drive services. Also the family did not reject, there were many factual errors, but they did not reject a September 2008 IEP. There was no IEP. It was a parent request to find out what was going on, because they were continually denied information that bore on their child's progress in school. So if there's a passage of time, is it your view that it's not appropriate for the district to reassess a child due to the passage of time, and maybe some noted changes in the child's reactions or capabilities? Some intermediate review and assessment is entirely appropriate, but that is a decision for the IEP team. It is a decision that is specifically provided for under the IDEA under Part C of Section 1414. So the entire team, including the parents, your argument is the entire team, including the parents, should have decided whether or not a reassessment was appropriate, rather than the school district unilaterally deciding to reassess. And it was not just the school district. This was unilaterally decided before the administrator met with the IEP team. It was unilaterally decided purposefully to cut off the IEP rights, as is demonstrated by her communications. The district cannot do it unilaterally, but moreover, an administrator who had never been a member of the IEP team, had never met this child, cannot unilaterally drive the decision of it's time to reassess this child. And so is there a provision in the IDEA that you're relying upon to support your position that it was inappropriate for the district to conduct a reassessment? There is. It is implicit in the procedural requirements for IEP team review. That is throughout the IDEA. And specifically subsection C of 1414 requires for any reassessment that you review data that the IEP team meets and reviews that and decides what data is necessary by this new assessment. What are you looking for? What do you need to identify? That's the team cooperative process, not a new assessment driven by, well, you've got a problem with the old assessment, we'll nullify that, we'll give you another assessment, then you can challenge that one down the road after you try it out for a while. That is inherently building in the delay while this child's needs are met. Is there a case that you can point us to to support your argument that an interim reassessment by the school district is in violation of the IDEA? I don't think that there is any authority on that, if it were. I don't think we would have the confusion that we have. There is no case law that I'm aware of on that point. So the withholding of this child's RTI data and specifically those communications from the school district about we went to the school district to get the RTI data, which is a very interesting testimony that school staff, teachers relied on this data to decide whether the child was progressing through the response to intervention protocols, whether that data was used to determine his eligibility by the district and is irrelevant. So when did the parents get the RIT data? They still to this day do not have complete RTI data. They have incidental reports of one score in isolation, then another score. They never received the graph that shows, that we attach, that shows progress over time. They're, like many computer programs, you put in the data and it can be printed in different formats, collating the data in a graph format, in a bar format, in a narrative format to show progress. So if it, I think the district's position is that there was no obligation to produce that data, because that data was not relied upon in developing the IEP. Do you agree with that position? No, Your Honor. That's absolutely contrary to section 1415B, which says the student's parents are entitled to all records. All records. And regardless of whether they use them for their, and the IEP team decides that eligibility. The parents are a part of that team. The district does not decide the basis upon which eligibility is determined. And so the parents not knowing, how could they challenge? How could they challenge the determination that it was a severe discrepancy, or the reason for the severe discrepancy, when they didn't have comparative data, which is required by California law. Other assessments, not just the district's assessment. Comparative data is required, and there was none cited in the IEP. This comparative data, the parents had a right to know, they had a right to present it at hearing, they had a right to present all this evidence at hearing, and they didn't have that evidence. So one thing we want to avoid is any possibility of a remand to consider new evidence, because that's not provided for by the IEDEA. It says the district court, and now this court could decide the issues. As far as the administrative relief, this court should decide, based on a matter of law, that the withholding of this data and these correspondence denied the child a FAPE, violated IEDEA, violated Section 1415 procedural safeguards specifically, and prevents the district from disputing the denial of a FAPE. From Rowley forward, the Supreme Court holdings, the Ninth Circuit holdings all have affirmed that this right to procedural safeguards is paramount. Parents cannot participate without it. It's a per se violation of FAPE. And as a matter of fact, it's a violation of FAPE for the three years. Regarding the private right of action, it's a very complex issue, but the Supreme Court holding in Rancho Palos Verdes and the Supreme Court's holding in Franklin, in Franklin it clearly explains that an intentional violation of a federal statute, all relief is available for an intentional violation when no relief is provided. It's our position that the implicit right to enforce the state and the district's duties under the IEDEA supports a private right of action, and that all available remedies should be available to the student. Other states have found that Section 1983 provides this relief, that it is the means by which you recover injunctive relief, declaratory relief, and damages. In the Second, Eleventh, and Seventh Circuit, they use Section 1983. This Court's rejected that analysis, and it is implied that there is no prohibition on damages, that there is no limit to IEDEA's reach when violations are intentional. The CO case versus Portland Public Schools, that was against an attorney, where this Court found that there was no private right of action. That attorney had no specific duties under the IEDEA. And there was no, there was the intentional aspect to it, of violating the IEDEA. To the extent that could have been brought against the district, we think it would have reached a different result. The intentional violations by the district, that the family has a special relationship with, relies upon for getting their rights under the IEDEA and appropriate services. When they engineer an intentional act, and we should be able to prove that fact in the district court on remand. As far as CDE, the Morgan Hill case basically sets out the analysis that we agree with. CDE has a duty to ensure a FAPE, and to the extent it does not complete a CRP process, and it does not independently investigate whether parents file a complaint or not, they need to make sure that the district is doing their job, especially when they have notice from the decisions that they reach with the students' names redacted, we should be able to get that evidence and prove that case. Against the CDE, we should be able to prove that they didn't comply with their obligations under the IEDEA. You're down to about two minutes. Do you want to reserve? Good morning, Your Honors. I'm Len Garfinkel for the California Department of Education, and it's the State Education Agency which handled the informal compliance complaint that preceded the more formal due process hearing between the student and the local educational agency that is the subject of the dispute here. While we agree with the district court's result that the CDE acted properly, we would ask you to ---- Well, it said it had no duty. You had no supervisory duty. I'm not sure it said you acted properly. I missed the first part. I'm sorry. I think the district court actually said something else, but it said you had no liability because you had no duty to supervisory power. I don't think there was a fine. Was there a fine if you acted properly? On the OAH piece, that's correct. The district court said ---- I was referring actually to the set-aside piece. Are you representing the school district as well? No. Okay. So there would be someone else arguing that part. Yes. We would ask the court to affirm the district court as to the CDE on the additional ground that there's no private right of action for the appellant to challenge the CDE's handling of an individual compliance complaint in Federal court. And therefore, the district court actually need not and perhaps should not have necessarily engaged in analysis of the merits of CDE's handling of that complaint. We think they got it right, but we would ask the court to engage in that analysis of whether it should be affirmed on an additional ground, because this is the first of four cases on this issue pending in this court, and we believe it's an opportunity to resolve all four cases. We think that the previous statements by the Ninth Circuit that have touched on the issue are clear, and that as we've cited, there are some unpublished opinions in the Ninth Circuit which we think have simply applied that rule. We understand they're not cited for their persuasive authority, but we've cited them simply to show that we think the court has applied those rules that we've cited from Lucht and Porter and the others in those cases. So what is the what redress does a parent have who is dissatisfied with the resolution of a complaint by the CDE? When a parent is unsatisfied with the result, if that case involves one of the four elements that are valid subject of a due process hearing, identification, assessment, eligibility, and free appropriate public education, the parent can go to the due process hearing, get the full due process hearing, develop the full administrative record with full procedural safeguards, and if unhappy with that result, the parent can appeal that to the district court. What if it's outside those four areas? Is there any redress? I mean, if there is an assertion that parent, that children of a particular ethnic group are treated differently in the process, what's the redress for that? There's no specific appellate right for an individual case, excuse me, there have been some cases where the parent has been treated differently, and there have been cases that suggested when there's a systemic type situation that there can be an excusal of the exhaustion of the due process in a systemic case. So there are, I mean, you're not saying that there is no redress in that, I mean, there's, are you saying that there's no redress for an individual who has a complaint about the process of that nature? There is none. There is none. So then that would imply that relief can be had in court? You're saying no one can sue in court if there's a violation of their rights? Congress did not intend that if a parent was dissatisfied with the result of a compliance complaint that they could proceed directly to court. I'd like to illustrate that by pointing to the appellant cited 1412. Why wouldn't there be a right to go to court under 1983 if, for example, there was a racial discrimination in a particular case as opposed to systemic violations? Well, there's a couple things there. I mean, 1983 was actually not raised in their opening. I understand. I mean, two things. First of all, you can't create a cause of action under 1983 that doesn't otherwise exist under IDEA for appealing from a compliance complaint. Second, in Blanchard, the Court has said that the remedial scheme of IDEA is sufficient to address cases about, you know, student's fate and that sort of thing. Right. But this would be outside the IDEA. In other words, you're saying there may be some redress, but it wouldn't be within the parameters of the IDEA. I think he's saying there's no redress of that. I'm hoping he's not saying that. There might be a case potentially in which, you know, a student could get to 1983. You know, as the Court said in Pam, you have to go through the case against the school district on the merits first, because, you know, it's a fate-based case. The crux of the case, as the Court said and mentioned in Pam and CO, is the crux of the case is an IDEA case. But I would like to touch on one point, which is 1412A14E. It's cited for the first time in the reply, and it actually supports our position. It's cited from the Morgan case as support for their position, but it supports ours, because it's responding to the No Child Left Behind for highly qualified teachers, and it says you cannot bring a due process case and then go to federal court on an issue simply that the teacher is not highly qualified. There would have to be more to it to show that you have a fate claim that can be the subject of due process or going on to federal court, but that you can file a compliance complaint on it, because there's no private right of action as to a compliance complaint. If the parent were to lose on a compliance complaint on a highly qualified teacher, they would have to go to federal court. They would not be able to then go to due process, because that's what that says. That's consistent with 1415F3F, which we've cited. And I see that my time is up. Thank you. Amy Levine, appearing on behalf of the Lafayette School District and the Lafayette Board of Education. Just to briefly follow up on counsel for the California Department of Education's point about the private right of action, that was also raised against the district. The district court did not reach that. Didn't resolve that issue. I believe that it did, and twice found that there was no private right of action under the IDEA for damages. I see you're talking about a slightly different issue. Yeah, so just to kind of amplify that, I think that the CO versus Portland School District case is squarely on point, that there is no private right of action for procedural violations directly under the IDEA, and that found that there was not even nominal damages available there. And this court, in the related proceeding before this court in this case, previously found that there was, that the process is that if a party is aggrieved by a due process decision, then there's a remedy through this court for issues regarding FABE eligibility and so on. And that's what these parties are seeking. These parties are seeking relief under the IDEA, so they're not seeking individual damages. They're seeking reimbursement and attorney's fees as a result of what they say was a flawed IDEA process. Right. And we don't have a quarrel with the fact that they have a right to that process. So there are many, many issues that were raised in this appeal. Could we start with the ones that were articulated here, including the RTI information and why? I thought it was the district's position that that information was not required to be produced. So are you agreeing that the information requested was not produced to the parents? No, we're not agreeing with that. We're agreeing, what we're saying is that there were two different processes at the time that this initial assessment was conducted by which a district could choose how to assess a child for eligibility under the IDEA. Why does that really affect the right to get the information? I mean, I understand that you have the right to pick your methodology, and there are two accepted methodologies. But assuming hypothetically that you didn't provide the information to the parents before the meeting, I just don't understand why the district wouldn't provide the information. Well, we don't really have an affirmative obligation to provide each and every piece of paper. Leaving aside your affirmative obligation, why did the district not provide the information? Well, what happened was that there was a series of meetings and contact between the parents and the school district for about a year and a half before the initial IEP meeting. There were student study team meetings where the data was reviewed with the parents. There were progress. Was the data the RTI data? Yes, some of the RTI data was part of it. But not all, but not all. I mean, maybe you can correct me if I'm wrong, but I had the impression that some of the RTI data was turned over and some wasn't. And from the little portion I've seen, it does contain a lot of information that would be highly relevant in determining what the appropriate  I don't know that we had all of that information. The only answer I see in your briefs is we don't have to. Well, I don't think that I've ever explained why you wouldn't turn it over. Well, I do think that the briefs, I think, also address the fact that we had provided much of that information. There's a factual dispute about how much, but nobody disputes that they didn't get it all. Everybody agrees they didn't get it all, even apparently until this day. So why not turn it over to them? I don't know that we had it all. I mean, a lot of it was very informal, where we had a process where the kindergarten or the first grade team would sit in a room and say, what are we going to do for these kids, we're going to stick their names up all on a wall, we're going to have sort of a fluid discussion about it. Not to interrupt, but I do recognize there's a subjective component to the RTIs, but there's also an objective component because it's supposed to be data-driven. And, you know, I looked at some of the RTI information and thought, well, this is pretty relevant information for parents to have. Right. And it differed from the information that came out of the 2007 evaluation somewhat. Well, essentially, as I understood their point, their point was that they had, that that information would have allowed them to have more information about how he might have sped up his progress or done better, and that's not really the IDEA standard. The IDEA standard is whether the IEPs were reasonably calculated to provide an educational benefit. But how would the parents know that if they don't have the information? The problem, it's kind of a circular argument, because it's not up to the school district to determine what the parents, what would be helpful to the parents in participating in the IEP process. And that's the parents' argument, is that we should have been given the information so we would be fully informed about what we were facing. Whether or not the school district thought it was pertinent isn't really the issue, it's whether it would be helpful to the parents in participating in the process. Well, I think it's a bit of a two-way street. We have a lot of information, as do all government agencies, and we provide what we think is relevant and informative at the time and what we're legally obligated to provide. They have a right under the IDEA to also ask for information. And so when that request comes in, then we respond to it. And actually under state law, we have to respond within five school days. So your response was we didn't use this in conducting the assessment, so it's not something that the parents should have? Was that the response? What was the response? I don't think we ever said the parents shouldn't have it. I think it wasn't requested. It wasn't something that was part of our ---- It was not requested? It was not at the time of the initial eligibility. Because they didn't know it existed. Excuse me? They didn't know that all the information existed, from what I understand their argument to be. They didn't know? That's what I take from the papers. Well, some of that information was in the progress reports that he was getting every trimester. The parents and the teacher were in constant contact. They had meetings along the way. So I think that there was a good exchange of information. But the parents are not the specialists. I mean, as a parent, you know, the parents are just trying to figure out how can we help our child to be, you know, to matriculate successfully in school or to the degree that is possible under the law. And so the parents are relying on the school district to give them the information they need. It's a little bit, I think, disingenuous to say, well, they should have ---- if they had asked us for it, maybe we would have thought about it. Because how would the parents know what to ask for if they're not specialists? They're trying to navigate this very complicated area. How would they know? Well, I think, again, these parents were very actively involved. But in addition, what I would also like to say is that we did a thorough assessment at this time. We had our school psychologist conducting a series of formal assessments, reviewing classwork, talking to the parents, talking to the teacher, doing observations. We also had our instructional support program teacher doing academic assessments at this time. So the process is to come forward with a wealth of information about the student and not make the eligibility determination based on any one test or criteria, but to look at the whole picture. And we think that we did that. How can they look at the whole picture if you won't give them the whole picture? We looked at it, but how about them? No, no. I'm talking about at the IEP meeting. We all came together and met and reviewed the assessments, and they had that information in advance. So this entire case jumped the tracks at the first IEP meeting. And when I say jumped the tracks, that's when the disagreements arose. And you had auditory processing disorders. You had some possible dyslexia that aren't reported on the IEP. And those are different from the phonological deficits that are noticed on the IEP. So the argument is, look, they should have had some intervention on those additional items. Now, what I really couldn't understand is the ALJ and then the district court say, well, it all had to do with reading, and he was getting treated for reading, and that's the end of the story. But actually those are quite distinct learning disabilities, at least evidence of which seems to be in the RTIs that I've seen. That would have been a red flag. If you're having problems with certain kinds of memory, that's been an auditory processing as opposed to, you know, phonological or dyslexia. I mean, to me, there was things that jumped out in those reports, the RTIs, that weren't contained in the assessment that would have been valuable information to have. Sorry to give a long diatribe, but feel free to respond. Right. There was really you mentioned that there was a disagreement from the beginning. There was no actual disagreement from the beginning. There was no real disagreement until about a year and a half later. And as far as the assessments go, we did assess for all suspected of areas of disability, which was what we were charged with doing. At that time, we didn't suspect that there was a specific auditory processing disorder that was above and beyond the phonological processing disorder. The teachers and the assessors both found that as far as his ability to listen to information and process and respond to information that was received in an oral basis, that it was average. What they found was that there were issues with phonological processing and working memory. And based on that, they built the IEP. And based on that, he had success in his program. We set out in a brief how he made progress every year, which is essentially the standard that we were looking towards, that our IEP was reasonably calculated to provide an educational benefit. He came in with knowing a couple of sight words and not being able to read quickly enough so that he could actually understand what he was reading out loud. You know, in the first year, then his oral fluency is doubling. He's being able to read sentences. He's being able to do a lot of things that he wasn't able to do. And then by third grade, it's even better where he's putting together, you know, summaries of information and he's enjoying reading out loud. And there's progress. And essentially he was placed in a Tier 1 program as opposed to a Tier 3. Is that right from the beginning? Am I getting that? I think that's correct. So Tier 1 is minimum. There's Tier 2 and there's Tier 3. So why wouldn't the RTIs be relevant in determining whether or not he was appropriately placed in Tier 1, 2, or 3? It was relevant. Now, RTI, we were not using it as sort of as it was defined in the IDEA. Not an assessment tool, but a... Just as an intervention. We were doing it for everybody and not just for kids that we suspected might need special education. And so based on where he came in at the beginning, we thought let's just try a little bit of intervention here. And we did some classroom intervention and we had him working with a reading specialist. And then as time went on, we thought, well, maybe let's try a little bit more and then let's try a little bit more and then let's refer him for special education. And that's when we did our evaluation and found out that he was eligible. Counsel, if the record reflected that the child was making progress each year, why do you suppose the parents nevertheless assert that he was not getting an appropriate education? I think that because he has a learning disability, they felt like his progress was slow. And, you know, there's a wide range of how students at the time it takes for a student to learn to read. And he was at the longer end of that spectrum than some other students. And, you know, we've all seen children who know how to read before they even enter kindergarten. And it's a frustration for the parents, no doubt. But it's not just reading, you know. There's a child who also has an auditory processing disorder that impairs his ability to be in the classroom. And this all seems to be conflated into one disability when there may be several. Well, again, our obligation is not really to label what his disability is. Our obligation is to determine whether he meets one of 13 eligibility categories, which is what we did, and then to design an appropriate program. But I think my point is that in designing a program, it's not a one-size-fits-all situation. So that's the critical component that disturbs me about not providing full information to begin with. Just along those lines, when we did receive further information about an auditory processing disorder, we determined that there were certain recommendations that their private evaluator had made and that we had already been implementing many of them. When we received the report, we provided others. And Adams v. State of Oregon, I mean, it was made clear that IEPs are judged prospectively based on the information that we have at the time and not retrospectively. So things do evolve, and as we get more information, we adjust. And that was what we were charged with doing, and that's what we did. I just want to make sure you covered the points you want to cover. Our questions have taken you over time. Is there anything else you want to address before sitting down? Let me just briefly address the mootness issues. While you're turning there, would you please address opposing counsel's position that it was inappropriate for the district to initiate reassessment without involving the parents? Okay. To take that question first, the process is that a parent can request an assessment, a district can request an assessment. There's certain time periods every three years that the district must reassess. But at each time that an assessment comes up, the parent has the right to consent or not consent to what is being proposed by the district. So the parent might request a certain assessment, the district comes up with an assessment plan, and then gives it to the parent, and the parent has the right to consent or not consent. So they may have the discussion about it together. That could be in an IEP meeting, it could be in a separate meeting, it could be on the phone. Or they could be doing it separately and make requests to each other. And that's the process. And then if one party wants an assessment that the other party doesn't want, then either could file for a due process on it, and that is the process. It's not necessarily something that needs to occur during an IEP meeting. I thought that's what opposing counsel said that under 1414, that the assessment is part of the IEP process and the district is not empowered to unilaterally do the assessment without involving the parents. Do you disagree with that? I do disagree with that. They have the right to consent or withhold consent, but that can be designed and usually is designed and proposed separately by a district without the parent being present. So as far as the mootness goes, there were a couple of issues that Judge Yelston determined were moot. One is whether or not the administrative law judge correctly reduced the amount of the reimbursement owed to the parents for the independent assessment from $4,800 to $2,400. During the interim, before this case wound up on summary judgment, the district paid the additional $2,400. That was about seven months before it got to a decision on summary judgment. At that point, there was nothing left to talk about. There was nothing left they could get when they sought 4,800, they had 4,800. There's nothing left to decide there. The other issue that was deemed moot was whether or not the district could reassess. So the district had proposed a reassessment back in 2009. The parents had not consented to the entire scope of assessment. The ALJ found that the assessment could go forward, and then the parents appealed. In the meantime, there was a reassessment done, and that was by consent, and that was almost two years before we got to summary judgment. And that was the district's issue. District said by that point, we don't want to reassess, we already got the information. Reassessment now would be besides the point. So those were appropriately deemed to be moot. None of this is ongoing. The assessment process takes 60 days from when the parent consents. And then a due process hearing, if anybody wants to challenge whether or not an assessment should occur or whether an assessment is appropriate, is supposed to happen within 45 days from when the complaint is filed. This student is an eighth grader. We are a K-8 district. There is not a real potential that this is going to recur. This is not, these issues are not sets of short duration that they're, they couldn't be reviewed in an appropriate case. Here we had lengthy litigation that lasted for four years, and that's why certain issues became moot during that period of time. There's not, there was no succession of illegal activity. There was nothing illegal about paying another $2,400 or deciding we didn't want to reassess. There's no collateral legal consequences here. The fact that there's an attorney's fees issue is not a collateral consequence. There's, the fact that there's an adverse administrative decision out there that they don't like that says that the assessment was, should have gone forward, is not basis enough for making a claim live. And there's no special rule under the IDEA that says that, that claims are somehow, can't be mooted because it's an IDEA claim. In fact, the statute provides for judicial review when a party is aggrieved, which means that there's a live controversy there. I think we have your argument. Okay. Thank you. Thank you. With regard to the mootness question, it's not collateral consequences, it's the court's jurisdiction. The court had jurisdiction to provide declaratory relief and obligation to determine prevailing party attorney fees in both cases. The court had jurisdiction, they had jurisdiction to award declaratory relief and establish prevailing party status for the allegations in the complaint. The reassessment was not the same reassessment, it didn't even assess cognitive. It, they agreed on the IEE's cognitive. So the mootness question we believe is clear. As far as, I must read 1414C in part, additional requirements for evaluations and re-evaluations, review of existing data as part of an initial evaluation and as part of any evaluation under this section. The IEP team and other qualified professionals shall review existing data, I'm only reading parts, evaluations and information provided by the parents, and on the basis of that review and input from the parents, identify what additional data if any is needed. And that was not done here. Although the parties agree on, the parties can each propose an evaluation, they do it at an IEP meeting. Then when the parents disagree, then a hearing can follow. As far as the parents not requesting the data, ER619, the parents' letter on December 9th, 2008, expressly requested all protocols, all information, all test results, all correspondence, those items were withheld. The evidence demonstrates that the administrator asked the school psychologist to change the evidence by signing his report, suggesting he was more involved than he was. The school psychologist did not evaluate this child, it was a student intern who knew nothing about RTI. She was there for one year to learn how to do assessments, and it's a very important question that this student should not have been evaluating under the IDEA. Her credential didn't authorize that. There are lots of factual things that we disagree with as far as what has been represented to this panel, as far as what were the facts, what information was provided. We believe it's very clear that complete information and relevant information was not provided and that that failure is a denial of a faith. As far as CDE's argument, redressing a CRP, if there's no remedy under the IDEA, and we asked the court in probably a footnote that if Section 1983 becomes pertinent, because that is a very complex question and certainly outside what was available in our page limit, if there's no redress, then we would have a right under Section 1983. And that also goes to the Supreme Court's holding in Franklin that implicit in an applied right, finding a private right of action, is that all remedies are available. So we do seek declaratory relief regarding legal issues, questions of law, undisputed fact, but to the extent that there are disputes about what the evidence showed and those are material, we don't think they are, but to the extent they are, we believe that the summary judgment process was premature. There was no discovery. We've never been able to question the district on what was done to obstruct this family's right to an IEE, who knew what, what they knew in addition. There certainly were teacher notes. The district contends that these were informal records. The school principal went back three years later and pulled the card off the wall and said, it was very interesting, all this stuff that I found. We've never received all that stuff. We received the school district's principal's summary of what she found. Your time has expired, but if you want to make a closing remark.  Thank you, counsel. Thank you both for your arguments. A very interesting and complex case, and it will be under submission. All rise. Thank you.
judges: Duffy, Thomas, Rawlinson